UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANCISCO P. FERNANDES,
   Plaintiff,

   v.                                    CIVIL ACTION NO.
                                 08-11498-MBB
ERIC HAVKIN,
ELITE MORTGAGES, INC. and
COUNTRYWIDE HOME LOANS, INC.,
   Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT COUNTRYWIDE HOME LOANS, INC.'s**
**MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 36)**

**August 10, 2010**

**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment (Docket Entry # 36) filed by defendant Countrywide Home Loans, Inc. ("defendant"), under Rule 56(c), Fed. R. Civ. P., seeking judgment in its favor on counts II, III, IV and V of plaintiff Francisco P. Fernandes's ("plaintiff") complaint (Docket Entry # 1).  The counts consist of claims for unjust enrichment, breach of fiduciary duty, violation of Massachusetts General Laws chapter 93A ("chapter 93A") and negligence, respectively. (Docket Entry # 1).  On January 27, 2010, this court held a hearing and took the motion (Docket Entry # 36) under advisement.

PROCEDURAL HISTORY

     On September 2, 2008, plaintiff filed the above styled action seeking damages on five counts involving mortgage fraud.

(Docket Entry # 1).  Defendant filed an answer and affirmative
defense to the complaint (Docket Entry # 17) on November 5, 2008,
and a cross-claim against defendant Elite Mortgages, Inc.
("Elite") (Docket Entry # 31) for indemnification and
contribution on June 1, 2009.

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "to pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine
whether trial is actually required." <u>Davila v. Corporacion De
Puerto Rico Para La Difusion Publica</u>, 498 F.3d 9, 12 (1st Cir.
2007).  As the moving party, defendant must make an initial
showing "that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of law."
Rule 56(c), Fed. R. Civ. P.  "A dispute is genuine if the
evidence about the fact is such that a reasonable jury could
resolve the point in the favor of the non-moving party." <u>Am.
Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge,
Structural, Ornamental & Reinforcing Iron Workers</u>, 536 F.3d 68,
75 (1st Cir. 2008).  "A fact is material if it carries with it
the potential to affect the outcome of the suit under the
applicable law." <u>Id.</u>

Once the moving party properly supports its motion for
summary judgment, "the burden shifts to the nonmoving party, with

respect to each issue on which it has the burden of proof, to demonstrate that a trier of fact reasonably could find in its favor."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  Facts are viewed in favor of the nonmovant, i.e., plaintiff.  See Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  "Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted."  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d at 12.

The nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" with respect to each element on which he "would bear the burden of proof at trial."  Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006); see F.D.I.C. v. Elder Care Servs., Inc., 82 F.3d 524, 526 (1st Cir. 1996) (if a party opposes summary judgment by demonstrating a "factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove that fact in its favor").  To this end, "'conclusory allegations, improbable inferences, and unsupported speculation,'" are insufficient to establish a genuine dispute of fact.  Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996)).

Defendant submitted a Local Rule 56.1 ("LR. 56.1") statement of undisputed facts (Docket Entry # 38) to which plaintiff filed a response (Docket Entry # 44).  Uncontroverted statements of fact therein comprise part of the summary judgment record.[1]  <u>See Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 11 (1st Cir. 2003) (nonmovant's failure to contest a date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); <u>see also</u> <u>Stonkus v. City of Brockton Sch. Dept.</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the nonmovant failed to controvert).

## FACTUAL BACKGROUND

On July 8, 2002, Elite, a Pennsylvania mortgage broker company licensed to do business in Massachusetts, and defendant, a California mortgage company licensed to provide mortgages in Massachusetts, entered into a Wholesale Broker Agreement. (Docket Entry # 39, Ex. G; Docket Entry # 1, ¶¶ 3 & 4).  Under the Wholesale Broker Agreement, Elite brokers were responsible for contact with potential borrowers but were not authorized to modify any terms of the loans issued by defendant in any material respect.  (Docket Entry # 39, Ex. G & H).  Additionally, the agreement expressly stated that defendant and Elite "are

---

[1]  Statements of law in the LR. 56.1 statement of undisputed facts are not considered.

4

operating as independent parties" and that "neither party shall at any time hold itself out to any third party to be an agent or employee of another."  (Docket Entry # 39, Ex. G).  Plaintiff, a Massachusetts resident, was not apprised of this agreement. (Docket Entry # 43, ¶ 8).

On September 15, 2004, plaintiff purchased the property known as 691-93 Robeson Street, Fall River, MA 02720 for $375,000.  (Docket Entry # 39, Ex. A).  First Franklin Bank ("First Franklin") financed the purchase and plaintiff contributed a down payment of $19,500.  (Docket Entry # 39, Ex. C).  First Franklin made two separate loans to plaintiff:  the first loan was for $300,000 over a 30 year period with a fixed interest rate of 6.5% for the first two years and the second loan was for $56,250 over a 15 year period with a fixed interest rate of 8.5% for the first two years.  (Docket Entry # 39, Ex. C & E). Plaintiff planned to refinance after the first two years. (Docket Entry # 39, Ex. C).

Plaintiff received a telephone call in January of 2006 from Eric Havkin ("Havkin") of Elite regarding refinancing plaintiff's First Franklin loans.  (Docket Entry # 43, ¶ 3).  During this call, Havkin informed plaintiff of a refinance loan with a 1% fixed interest rate over 30 years.  (Docket Entry # 39, Ex. C). After several phone calls and emails between Havkin and plaintiff, plaintiff states that he decided to refinance with the

understanding that he was receiving a loan with a 1% fixed
interest rate over 30 years.  (Docket Entry # 39, Ex. C).  On
January 12, 2006, plaintiff and Elite entered into the Borrower-
Broker Agreement, which deemed Elite the exclusive agent for
obtaining plaintiff's mortgage.  (Docket Entry # 39, Ex. F).

At the time of the closing, on February 23, 2006, plaintiff
noticed that the interest rate on defendant's loan documents was
2.5%.  (Docket Entry # 39, Ex. C).  At this time, plaintiff also
received disclosure documents pursuant to the Truth in Lending
Act which displayed the total costs of the refinance loan from
defendant.  (Docket Entry # 46, Ex. 1).  Plaintiff telephoned
Havkin regarding the discrepancy and Havkin assured plaintiff
that it was a mistake which would be corrected after plaintiff
signed the closing documents.  (Docket Entry # 39, Ex. C).
Plaintiff signed the documents with the understanding that the
mistake would be corrected, that the terms would be those that he
had discussed originally with Havkin and that plaintiff had three
days to cancel the transaction if Havkin would not agree to the
original terms as negotiated.  (Docket Entry # 39, Ex. C).

On February 24, 2006, plaintiff emailed Havkin regarding the
discrepancies between the closing documents and the terms of the
loan pursuant to their conversations.  (Docket Entry # 39, Ex.
M).  Specifically, plaintiff stated that he would cancel the
transaction unless the monthly mortgage insurance ("PMI") was

waived, the monthly payment was $1,537 for 30 years and the interest rate was fixed, not variable.  (Docket Entry # 39, Ex. M).  In closing the email, plaintiff stated, "Unless I receive from you these assurances, I may find myself forced to cancel this whole thing by Monday for it is too much of a risk that I cannot afford to take" and that "lots of information you provided me did not materialize in the actual closing paper work that really matters."  (Docket Entry # 39, Ex. M).

Subsequently, Havkin reassured plaintiff in writing that discrepancies in the closing documents were a mistake and would be corrected.  (Docket Entry # 39, Ex. C).  Specifically, Havkin communicated that the PMI would be "taken off," that plaintiff would have a fixed payment of $1,537 for 360 months and that the interest rate would not change unless plaintiff made interest only payments.  (Docket Entry # 42, Ex. 1).  Havkin further stated that "The closing paperwork is very confusing and it is legal vocabulary.  This is a simple understanding of your new mortgage."  (Docket Entry # 42, Ex. 1).  Plaintiff did not cancel the transaction within the three day period.  (Docket Entry # 43, ¶ 12).

Plaintiff's first loan payment bill, however, retained the unchanged terms of the loan to which plaintiff signed.  (Docket Entry # 39, Ex. C).  Plaintiff contacted Havkin via telephone after receiving the first bill and Havkin assured plaintiff that

he would correct the discrepancy.  (Docket Entry # 39, Ex. C).
Until Havkin left Elite, plaintiff continued to communicate with
Havkin regarding a potential second refinancing transaction to
restore plaintiff to his original position before refinancing.
(Docket Entry # 39, Ex. C).  After Havkin left, plaintiff
corresponded with other employees, including Elite's president,
Yan Kodomsky, about changing the terms of the loan.  (Docket
Entry # 39, Ex. C).

        According to Havkin, an account executive for defendant,
Tina Wilson ("Wilson"), had visited Elite to educate the brokers
regarding defendant's new products and to encourage the brokers
to solicit potential borrowers.  (Docket Entry # 42, ¶¶ 2 & 3).
Wilson allegedly made herself available to answer any questions
regarding defendant's products during plaintiff's loan
application and closing process.  (Docket Entry # 42, ¶ 4).  When
Havkin initially contacted plaintiff about refinancing, Havkin
states that he described defendant's loan product exactly as
Wilson had explained it to Havkin.  (Docket Entry # 42, ¶ 8).
After receiving the email from plaintiff on February 24, 2006,
regarding the discrepancies in the loan terms, Havkin claims that
he consulted Wilson who confirmed the negotiated loan terms
before he emailed plaintiff.  (Docket Entry # 42, ¶ 12).  When
the first bill from defendant reflected the terms of the loan as
signed, and not as negotiated, Havkin claims that he contacted

Wilson who then changed her explanation of the loan terms. (Docket Entry # 42, ¶ 19).

Plaintiff subsequently contacted defendant seeking to put himself back to the position he was in before he refinanced. (Docket Entry # 46, Ex. 4).  Defendant offered plaintiff a loan modification for refinancing with a lower monthly payment but plaintiff did not accept.  (Docket Entry # 46, Ex. 4).  The loan modification would have increased his principal to a greater amount than the purchase price of the property.  (Docket Entry # 46, Ex. 4).  In an email correspondence regarding that offer, an employee of defendant referred to plaintiff's refinanced mortgage as "the worst mortgage in the industry."  (Docket Entry # 46, Ex. 5).

On April 13, 2007, plaintiff sent a letter to Elite, addressed to Yan Kadomsky, alleging unfair and deceptive trade practices pursuant to section 9 of chapter 93A.  (Docket Entry # 46, Ex. 13).  Although the letter was addressed to Elite, defendant responded to the letter on May 14, 2007.  (Docket Entry # 46, Ex. 13).  There was no settlement offer in defendant's response.  (Docket Entry # 46, Ex. 13).

DISCUSSION

I.   Breach of Fiduciary Duty (Count III)

In response to Count III alleging defendant's breach of fiduciary duty, defendant moves for summary judgment on the theory that no fiduciary relationship existed between defendant as a lender and plaintiff as a debtor.  (Docket Entry # 37). Plaintiff in response argues that defendant's active role in the refinancing process justifies an exception to defendant's theory and created a fiduciary relationship between plaintiff and defendant.  (Docket Entry # 45).  In addition, plaintiff argues that an agency relationship existed between Havkin and defendant, again creating a fiduciary duty of defendant to plaintiff. (Docket Entry # 45).

For the following reasons, this court finds no general issues of material fact regarding defendant's or Wilson's interaction with Havkin or with plaintiff during the brokerage process.  This court further finds that judgment should enter as a matter of law in favor of defendant on Count III.

A.   Fiduciary Relationship

Plaintiff alleges that defendant "violated [its] fiduciary duty by construing the [mortgage] transaction to [defendant's] benefit and plaintiff's detriment."  (Docket Entry # 1, ¶ 52). Defendant claims that plaintiff's argument fails as a matter of law because "under Massachusetts law, the relationship between a

10

lender and a borrower, without more, does not establish a
fiduciary relationship." FAMM Steel, Inc. v. Sovereign Bank, 571
F.3d 93, 102 (1st Cir. 2009); see Corcoran v. Saxon Mortgage
Servs., Inc., 2010 WL 2106179, *4 (D.Mass. May 24, 2010) ("under
Massachusetts law, neither a mortgage holder nor its servicer
owes a fiduciary duty to a borrower"); see also Pimental v.
Wachovia Mortgage Corp., 411 F.Supp.2d 32, 39 (D.Mass. 2006)
("[l]enders normally do not owe borrowers fiduciary duties").

Plaintiff argues that defendant's and Wilson's alleged
involvement in the brokerage process constitutes the something
"more" such that a fiduciary relationship is formed. (Docket
Entry # 45). To this end, plaintiff relies on the Declaration of
Havkin (Docket Entry # 42) to link Wilson, and thus defendant, to
Havkin's statements regarding plaintiff's loan. Although Havkin
alleges that he merely conveyed the terms of the loan to
plaintiff exactly as Wilson had explained them, neither Havkin in
his declaration nor plaintiff in his brief in opposition to
summary judgment provide any further specificity. (Docket Entry
# 44, ¶ 70; Docket Entry # 42, ¶ 8). The exact terms that Wilson
allegedly relayed to Havkin are unstated and left to inference.
In fact, the terms of the loan as negotiated – a 1% fixed
interest rate over 30 years – are not specifically mentioned in
Havkin's declaration. (Docket Entry # 42).

Plaintiff next claims that, after he noticed discrepancies between the closing terms and those negotiated, Havkin contacted Wilson who "confirmed the loan program terms." (Docket Entry # 42, ¶ 12; Docket Entry # 44, ¶ 72). Again, plaintiff does not specifically state what those terms were but rather relies on "conclusory allegations" and "inferences" to imply that Wilson verified incorrect terms. See Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d at 2. Notably, Havkin attached to this declaration the February 24, 2006, communication between Havkin and plaintiff, but none between Havkin and Wilson. (Docket Entry # 42, Ex. 1).

After plaintiff received his first bill from defendant and subsequently contacted Havkin, Havkin alleges that he again attempted to confirm the validity of the negotiated terms with Wilson. (Docket Entry # 44, ¶ 73; Docket Entry # 42, ¶¶ 16 & 17). At that point, according to Havkin, Wilson altered her description of the loan. (Docket Entry # 44, ¶ 73; Docket Entry # 42, ¶ 19). Neither Havkin nor plaintiff articulate from what, or to what, Wilson allegedly changed her description or provide any evidence in this respect.

Plaintiff thus fails to provide sufficient evidence to create an issue of material fact regarding defendant's involvement in the brokerage process. See F.D.I.C. v. Elder Care Servs., Inc., 82 F.3d at 526 (a party opposing summary judgment

"must point to evidence affirmatively tending to prove that fact in its favor"). Arguments put forth in Havkin's declaration (Docket Entry # 42) fail to "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Clifford v. Barnhart, 449 F.3d at 280. The conclusory allegations and inferences contained in the declaration do not give rise to a triable issue of fact. See Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d at 2.

Plaintiff analogizes to Bakis, in which the National Bank of Greece ("the Bank") actively solicited Greek-American investors to invest in a software company founded by individuals of Greek descent. Bakis v. Nat'l Bank of Greece, S.A., 1998 WL 34064622, *1-2 (Mass.Super. Dec. 15, 1998) ("Bakis"). The Bank targeted the Greek community of Greater Boston by exploiting personal relationships and invoking notions of Greek national pride and community spirit. Id. at *2-3. The Bank, however, failed to disclose to investors that they were solicited as a strategy to relieve the Bank of its liability on unsecured and risky loans issued to said company, or that the Bank had contemplated liquidating the company. Id. at *2.

In general, a customer who merely "reposes confidence and respect in the judgment of another and trust in his character cannot, without more, transform a business relationship into one which is a fiduciary." Id. (citing Superior Glass Co., Inc. v.

13

First Bristol County Nat'l Bank, 406 N.E.2d 672, 674 (Mass. 1980)); see Corcoran v. Saxon Mortgage Servs., Inc., 2010 WL 2106179, *4 (same).  "[A] fiduciary relationship arises when the defendant knowingly accepts the trust and confidence reposed in him by another and takes advantage of it to his benefit." Bakis, 1998 WL 34064622, *13; see FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 102 ("a fiduciary relationship may arise . . . where the borrower reposes its trust and confidence in the lender and the lender knows of and accepts the borrower's trust"); see also Corcoran v. Saxon Mortgage Servs., Inc., 2010 WL 2106179, *4 ("the defendant must know of and accept the plaintiff's trust"); Pimental v. Wachovia Mortgage Corp., 411 F.Supp.2d at 40 (a fiduciary relationship arises "if a lender both knows that a borrower is placing her trust in it and accepts that trust").

     The special circumstances in Bakis that justified an exception to the general rule that "the relationship of a bank as creditor and a customer as debtor is not that of a fiduciary" do not apply to the case at bar.  Bakis, 1998 WL 34064622, *13.  The court in Bakis held that in targeting the Greek community "the Bank knew and exploited the fact that [the investor] had a deep respect for financial institutions as well as a deep personal trust and respect for . . . the Bank's agent."  Id.  The Bank's actions constituted a self-benefitting acceptance of the

investors' trust such that a fiduciary relationship was formed. Id.

While the Bank in Bakis directly solicited investors, plaintiff and defendant lacked any direct relationship, certainly not one of deep, personal trust and respect.  There is no evidence in the record that plaintiff placed its trust in anyone other than Havkin, nor that defendant knew of or accepted any offers of trust from plaintiff.  Plaintiff has additionally failed to specify or demonstrate any special relationship between plaintiff and defendant or any specific deception on defendant's part.  Since no fiduciary duty exists when the relationship is "an arms-length, lender-borrower business relationship, not one of trust and confidence," defendant cannot be held to fiduciary duty standards as to plaintiff.  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 102.

In sum, there is no justification for an exception to the general rule that, under Massachusetts law, the relationship between a lender and a borrower does not establish a fiduciary duty.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 102; Corcoran v. Saxon Mortgage Servs., Inc., 2010 WL 2106179, *4; Pimental v. Wachovia Mortgage Corp., 411 F.Supp.2d at 39.

B.   Agency Relationship Between Defendant and Havkin

Plaintiff additionally argues that defendant violated a fiduciary duty in that Havkin, as an agent of defendant, violated

15

his fiduciary duty to plaintiff.  (Docket Entry # 45).  "Agency

is the fiduciary relation which results from the manifestation of

consent by one person to another that the other shall act on his

behalf and subject to his control, and consent by the other so to

act."[2]  Restatement (Second) of Agency § 1 (1958);[3] see

Commonwealth Aluminum Corp. v. Baldwin Corp., 980 F.Supp. 598,

611 (D.Mass. 1997) (agency relationship "results from the

manifestation of consent by one person to another that the other

shall act on his behalf and subject to his control"); see also

Motorsport Eng'g, Inc. v. Maserati SPA, 316 F.3d 26, 29-30 (1st

Cir. 2002) ("[a]n agent is simply someone who is authorized by

the principal to act on the principal's behalf and bind the

principal as if the latter were there himself").

The existence of an agency relationship under Massachusetts

law is "ordinarily a question of fact for the jury."  White's

Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 66 (1st

Cir. 1970) (whether equipment dealer was agent of equipment

manufacturer in breach of warranty action was a jury question).

_____

    [2]  In an agency relationship, "[t]he one for whom action is to
be taken is the principal" and "[t]he one who is to act is the
agent."  Restatement (Second) of Agency § 1 (1958).  Defendant is
therefore the alleged principal and Elite and Havkin the alleged
agents of defendant.

    [3]  Massachusetts courts often cite to Restatement (Second) of
Agency in determining the presence of an agency relationship.
See, e.g., Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d
1113 (Mass. 2000) (citing sections one, seven, eight, 14 & 15).

Plaintiff, however, retains the underlying burden of proof to establish that Havkin acted as defendant's agent during the refinancing process.  See Sabel v. Mead Johnson & Co., 737 F.Supp. 135, 138 (D.Mass. 1990) (plaintiffs "carried their burden of demonstrating the existence of an agency relationship").

Under Massachusetts law, "[a]n agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2000); see Restatement (Second) of Agency § 1 (requiring "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control"); Restatement (Second) of Agency § 13, cmt. a ("agreement to act on behalf of the principal causes the agent to be a fiduciary").

Plaintiff argues that Havkin "acted with apparent and ostensible authority" and "per the control and direction" of defendant but has provided evidence neither that defendant consented to an agency relationship with nor wielded any control over Elite or Havkin.  (Docket Entry # 45).  While there is no evidence of "mutual consent, express or implied, that [Elite or Havkin] is to act on behalf and for the benefit of [defendant]," there is an express agreement stating the contrary.  Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d at 1119.  The

17

Wholesale Broker Agreement explicitly states that "neither party shall at any time hold itself out to any third party to be an agent or employee of another."  (Docket Entry # 39, Ex. G).  This document articulates defendant's lack of consent to an agency relationship with Elite.  For the purpose of discerning an actual agency relationship, plaintiff's ignorance of it is immaterial. In light of this document, defendant cannot be held to have consented to an actual agency relationship with Elite or Havkin. As discussed above, plaintiff has failed to produce sufficient evidence of Wilson's interactions with Havkin and Elite. Arguments regarding Wilson's alleged actions and statements, therefore, cannot be relied upon to demonstrate consent on behalf of defendant.

Plaintiff likewise does not support his claim that Elite or Havkin was in any way "subject to the [defendant]'s control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d at 1119; see Commonwealth Aluminum Corp. v. Baldwin Corp., 980 F.Supp. at 611 ("[t]he essence of the principal-agent relationship is the right of power or control by the alleged principal over the conduct of the alleged agent").  The Wholesale Broker Agreement specifically states that defendant and Elite agree "that at all times they are operating as independent parties."  (Docket Entry # 39, Ex. G). There is no evidence in the record to contradict this agreement.

Plaintiff also alleges that Havkin acted with the apparent

authority of defendant.  "Massachusetts law recognizes apparent authority where 'conduct by a principal . . . causes a third person reasonably to believe that a particular person . . . has authority to enter into negotiations or to make representations as his agent.'"  Kansallis Fin. Ltd. v. Fern, 40 F.3d 476, 480 (1st Cir. 1994) (quoting Hudson v. Mass. Prop. Ins. Underwriting Ass'n, 436 N.E.2d 155, 159 (Mass. 1982)); see Restatement (Second) of Agency § 27 (apparent authority "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him").  If the third party changes its position in reliance on this reasonable belief, "the principal is estopped from denying that the agency is authorized."  Kansallis Fin. Ltd. v. Fern, 40 F.3d at 480.

Plaintiff fails to produce evidence that defendant acted in a manner to justify a reasonable belief that Havkin or Elite was an agent of defendant.  While plaintiff may have signed the closing documents and not canceled the transaction in reliance on Havkin's assurances that the terms would be altered, there is no evidence that defendant undertook any conduct that would cause plaintiff to reasonably believe that those assurances were made by an agent of, or per the instruction of, defendant.  The mere

allegation that plaintiff believed Havkin to be an agent of some lender "whatever formal name ultimately used" is insufficient to establish apparent authority.  (Docket Entry # 44, ¶ 9). Plaintiff must point to some conduct by defendant that justified his belief.  See Kansallis Fin. Ltd. v. Fern, 40 F.3d at 480 (requiring "conduct by a principal").

Absent a showing of any conduct that would cause plaintiff to reasonably believe that Havkin was an agent of defendant, the relationship between plaintiff and defendant remains merely one of a lender and borrower where no fiduciary duty is owed.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 102 ("relationship between a lender and a borrower, without more, does not establish a fiduciary relationship").

Plaintiff cites to Trifiro[4] for the proposition that defendant, through some conduct, bestowed apparent authority onto Havkin.  (Docket Entry # 45).  Plaintiff, however, misreads the decision.  Trifiro, a potential real estate investor, sued New York Life Insurance Co. ("NYL") claiming that a Real Estate Analyst at NYL negligently misrepresented himself during negotiations with Trifiro and his agents and breached a contract to market several commercial properties to Trifiro.  Trifiro v. N.Y. Life Ins. Co., 1987 LEXIS 6833, *9.

---

[4]   Trifiro v. N.Y. Life Ins. Co., 1987 LEXIS 6833 (D.Mass. July 14, 1987), aff'd, 845 F.2d 30 (1st Cir. 1988).

Trifiro claimed that the analyst was actively involved in the negotiation process and in a position of ostensible authority such that NYL must be held to the terms as negotiated.  Id. at *12.  Plaintiff submits that the facts at bar are analogous.  There is no evidence, however, that defendant was "indisputably actively involved" in the negotiation such that a belief of apparent authority would be reasonable.  (Docket Entry # 45).  The Trifiro courts, in fact, reached a similar conclusion.  While holding that "an argument could be made" that the analyst acted with ostensible authority, "any reliance by Trifiro upon [the analyst's] statements was not reasonable as a matter of law" because the assertions were made as part of mere preliminary negotiations.  Trifiro v. N.Y. Life Ins. Co., 1987 LEXIS 6833, *14, 18; see 845 F.2d at 33 ("purchaser did not reasonably rely on statement by vendor's officer" and therefore "could not recover for deceit or negligent misrepresentation").  Summary judgment was accordingly allowed, and affirmed, in NYL's favor on all counts.  Plaintiff's reliance on Havkin's alleged assertions, after acknowledging that the terms contained in the closing documents were vastly inconsistent with those negotiated, and acknowledging that it is "the actual closing paper work that really matters," is similarly unreasonable.  (Docket Entry # 39,

21

Ex. M).[5]

In sum, although agency is usually a question of fact, plaintiff fails in his burden to provide evidence demonstrating that defendant and Havkin were in an actual, apparent or implied agency relationship.  No genuine issue of material fact therefore exists and plaintiff's claim fails as a matter of law.  As no fiduciary relationship exists between defendant as a lender and plaintiff as a borrower, and as there is no evidence that Havkin acted as an agent of defendant, summary judgment is warranted in defendant's favor on Count III.


II.  Unjust Enrichment (Count II)

Count II alleges that Havkin "tricked" plaintiff into entering an unfavorable mortgage transaction whereby plaintiff lost approximately $40,000 in equity in his home and was forced to pay an excess of $167,000 in interest.  (Docket Entry # 1, ¶¶

---

   [5]  As with theories regarding actual and apparent authority, a claim of implied authority would likewise fail.  "Actual authority," either express or implied, is the agent's power to affect the principal's relations with third parties as manifested to the agent by the principal.  See Restatement (Second) of Agency § 7.  While "actual authority" results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal, "implied authority" is actual authority that evolves by implication from the conduct of the parties.  See Restatement (Second) of Agency § 7.  There is no evidence in the record that the inherent relationship between defendant and Elite evolved into one of an agency relationship.

45-47).  Plaintiff claims that, "as a result of Havkin's deceit," defendant made a profit on plaintiff's loss that constitutes an unjust enrichment.  (Docket Entry # 1, ¶ 48).

Plaintiff claims that defendant "engaged [in] deceptive behavior in order to induce [him] into signing mortgage documents consisting of terms vastly different than had been negotiated by him."  (Docket Entry # 45).  As a result, plaintiff submits that defendant holds a promissory note which, at the conclusion of the payment period, will net over one million dollars in payments to defendant where the payoffs on plaintiff's original mortgages were to be less than $370,000.  (Docket Entry # 45).  In addition, the promissory note is secured against plaintiff's residence so that if defendant forecloses on its security interest, defendant may obtain ownership of plaintiff's home. (Docket Entry # 45).

Defendant counters that plaintiff did not bestow any benefit on defendant for which it is unjust for defendant to retain. (Docket Entry # 37).  Defendant provided accurate descriptions of the loan terms at the mortgage closing.  Havkin, not defendant, was responsible for plaintiff's belief that the closing terms were a mistake.  (Docket Entry # 37).  In addition, defendant submits that it has sustained a greater loss as a result of the mortgage transaction than has plaintiff.  (Docket Entry # 37). Defendant disbursed $364,500 at the time of closing.  Plaintiff,

however, has repaid only $87,927.28 -- an approximate $275,000 loss for defendant. (Docket Entry # 37). Plaintiff has also benefitted from having his two First Franklin mortgages paid off as a result of the refinancing and, despite remaining on his property, has not made a mortgage payment to defendant "in over a year." (Docket Entry # 37).

"Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Kerr v. Vince, 2010 WL 1416511, *17 (D.Mass. Apr. 1, 2010) (quoting Santagate v. Tower, 833 N.E.2d 171, 176 (Mass.App.Ct. 2005)); see Taylor Woodrow Blitman Constr. Co. v. Southfield Gardens Co., 534 F.Supp. 340, 347 (D.Mass. 1982). For a claim to prevail in Massachusetts, there must be "'unjust enrichment of one party and unjust detriment to another party.'" Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir.), reh'g denied 559 F.3d 1 (1st Cir. 2009); see Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund, 582 F.3d 30, 42 (1st Cir. 2009) ("[u]njust enrichment, in a legal framework, comprises a claim or claims on which relief may be granted in a lawsuit by the person unjustly deprived").

"Not every conferral of a benefit . . . automatically give[s] rise to claims for unjust enrichment." Motorsport Eng'g, Inc. v. Maserati SPA, 316 F.3d at 31. Plaintiff must show that

he bestowed a benefit on defendant, that defendant's retention of that benefit is unjust and that equity requires that this court shift the benefit back to plaintiff.  See Taylor Woodrow Blitman Constr. Co. v. Southfield Gardens Co., 534 F.Supp. at 346-48.[6]

A claim of unjust enrichment, however, is "not available to a party with an adequate remedy at law."  Ben Elfman & Son, Inc. v. Criterion Mills, Inc., 774 F.Supp. 683, 687 (D.Mass. 1991); see Kerr v. Vince, 2010 WL 1416511, *17 ("[t]he equitable remedy for unjust enrichment is not available, however, to parties with an adequate remedy at law"); see also One Wheeler Road Assocs. v. Foxboro Co., 843 F.Supp. 792, 799 (D.Mass. 1994) (common law and statutory reimbursement remedies are adequate remedies at law that preclude unjust enrichment claims).  Plaintiff's negligence and chapter 93A claims thus preclude a claim for unjust enrichment.  The disposition of those claims is irrelevant.  Their mere availability is a bar to a claim of unjust enrichment.  See Adrion v. Knight, 2009 WL 3152885, *1 n.1 (D.Mass. Sept. 28,

---

[6]  The lack of a fiduciary relationship between plaintiff and defendant, as discussed above, does not preclude a claim of unjust enrichment.  See Greenwald v. Chase Manhattan Mortgage Corp., 241 F.3d 76, 78 (1st Cir. 2001) (doctrine of unjust enrichment does not require any contractual or fiduciary relationship between parties).  The essence of unjust enrichment is fairness rather than culpability.  See Id. at 81 ("[t]he origins of unjust enrichment actions lie largely in equity," and "[t]o some degree . . . reflect a weighing of whether an outcome is more or less 'fair' or 'just'"); see also Brandt v. Wand Partners, 242 F.3d 6, 16 (1st Cir. 2001) ("[u]nder Massachusetts law unjust enrichment does not always require finding of wrongdoing by the defendant").

2009) ("the availability of an adequate remedy at law (whether successful or not) precludes an equitable claim of unjust enrichment").

In addition, the mortgage between defendant and plaintiff constitutes an express contract which governs their relationship in this matter. (Docket Entry # 39, Ex. I). In an unjust enrichment action, a court can infer an implied contract where none would otherwise exist. See Incase Inc. v. Timex Corp., 488 F.3d 46, 54 (1st Cir. 2007) ("[u]nder Massachusetts law, a quasi-contract may be implied in law to remedy the unjust enrichment of another party, even where the facts do not necessarily support the existence of an express or implied-in-fact contract"). Where there is an express contract, however, the terms therein are controlling. "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006); see Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 162 (1st Cir. 2005) ("plaintiff concedes the existence of a valid express contract between the parties – and the existence of such a contract bars the application of the equitable doctrines that he . . . invokes").

Parol evidence is not generally admissible to vary the unambiguous terms of an integrated written contract. See Winchester Gables, Inc. v. Host Marriott Corp., 875 N.E.2d 527,

26

533 (Mass.App.Ct. 2007).[7]  While a party may provide proof of
prior negotiations, the determination of whether the parties
intended their written contract to be a statement of their
complete agreement is a decision to be made by the court.  <u>Cabot
v. Cabot</u>, 774 N.E.2d 1113, 1120 (Mass.App.Ct. 2002); <u>Ryder v.
Williams</u>, 558 N.E.2d 1134, 1135-36 (Mass.App.Ct. 1990).

Where a document "shows on its face that it contains all the
essential terms that are necessary to constitute a contract, it
is presumed that the parties intended it to be a complete and
final statement of the whole transaction." <u>Latham v. Homecomings
Fin. LLC</u>, 2009 WL 6297593, *4 (Mass.Super. Nov. 3, 2009); <u>see
Gifford v. Gifford</u>, 236 N.E.2d 892, 893 (Mass. 1968).

Accordingly, where the "mortgage executed by [plaintiff]
contain[s] all the essential and material terms necessary for a
loan transaction, and constitute[s] a completely integrated
agreement . . . the parol evidence rule bars consideration of any
evidence proffered to impose additional duties on [defendant]."
<u>Latham v. Homecomings Fin. LLC</u>, 2009 WL 6297593, *4; <u>see Carney
v. Shawmut Bank, N.A.</u>, 2008 WL 4266248, *2 (Mass.App.Ct. Sept.
19, 2008) (where a document is a fully integrated agreement, "the

---

[7]  A fully integrated contract is a statement which the parties
have adopted as a complete and exclusive expression of their
agreement.  <u>Restatement (Second) of Contracts</u> § 210(1) (1981);
<u>see Starr v. Fordham</u>, 648 N.E.2d 1261, 1268 n.8 (Mass. 1995);
<u>Cabot v. Cabot</u>, 774 N.E.2d 1113, 1120 (Mass.App.Ct. 2002).

parol evidence rule bars consideration of evidence proffered to contradict explicit terms . . . set forth in the writings").

Plaintiff's mortgage, as a fully integrated and express contract, precludes consideration of any negotiation or statements made by Havkin prior to the closing, at which time defendant provided accurate descriptions of the loan terms to plaintiff.  The mortgage contract precludes plaintiff's claim for unjust enrichment as plaintiff cannot argue the unfairness of terms which he accepted and per which he contracted.  See Carney v. Shawmut Bank, N.A., 2008 WL 4266248, *2 ("the parol evidence rule bars consideration of evidence proffered to contradict explicit terms . . . set forth in the writings").

It is therefore unnecessary to determine the relative degree of enrichment and detriment between plaintiff and defendant as plaintiff's claim is precluded as a matter of law.  As plaintiff cannot sustain a claim for unjust enrichment, summary judgment is appropriate in defendant's favor on Count II.


III.  Chapter 93A (Count IV)

Count IV alleges that defendant violated chapter 93A in that defendant "participated and/or benefitted from a mortgage refinancing transaction" that "was based on fraudulent representations that were made knowingly by [Havkin]" as an agent

of defendant.[8]  (Docket Entry # 1, ¶¶ 57-59).  Plaintiff further

alleges that the final terms of the loan, as detailed in the

closing documents signed on February 23, 2006, facially violate

chapter 93A and are patently unfair as a matter of law.[9]  (Docket

Entry # 45).

    Defendant counters that a chapter 93A claim must fail as

Havkin was not in an agency relationship with defendant,

defendant provided accurate disclosures to plaintiff regarding

---

[8]  Plaintiff does not specify in his complaint (Docket Entry #
1) or in his brief in opposition to summary judgment (Docket
Entry # 45) under what section in chapter 93A he rests this
claim.  For the purposes of its brief in support of summary
judgment, defendant assumed this action was brought under section
nine as it involves "a consumer action against a business
entity."  (Docket Entry # 37).  Plaintiff responds that his
claims are not limited to section nine but does not specify the
other applicable sections.  (Docket Entry # 45).  This court
addresses plaintiff's claims under sections two and nine of
chapter 93A.  See, e.g., Hogan v. Riemer, 619 N.E.2d 984
(Mass.App.Ct. 1993) (applying section nine to individual
mortgagor's chapter 93A claims against mortgagee).  Section 11 is
inapplicable as it pertains only to a party "who engages in the
conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, §
11; see Trs. of Boston Univ. v. ASM Commc'ns, Inc., 33 F.Supp.2d
66, 76 n.16 (D.Mass. 1998) ("[s]ection 11 is only applicable if,
first, "the interaction [between the parties] is 'commercial' in
nature, and second, ... the parties were both engaged in 'trade
or commerce,' and therefore acting in a 'business context'").

[9]  Regarding the chapter 93A claim, the complaint centers on
Havkin's alleged misrepresentations by which plaintiff "was
harmed by the mortgage transaction."  (Docket Entry # 1).  The
complaint does not allege the terms of the loan themselves to be
in violation of chapter 93A.  (Docket Entry # 1).  It is only in
plaintiff's brief in opposition to summary judgment does he raise
the argument that the final terms of the refinanced loan are
unfair as a matter of law and in violation of chapter 93A.
(Docket Entry # 45).

the terms of his loan and plaintiff failed to send a written
demand for relief as required per section nine of chapter 93A.
(Docket Entry # 37).

A.   Alleged Misrepresentations as Deceptive Trade Practices

     Plaintiff argues that defendant, through an agency
relationship with Havkin, employed deceptive methods during the
negotiation process to mislead plaintiff into signing a loan
which was to his detriment.  (Docket Entry # 1, ¶¶ 57-59).
Defendant rebuts that it is not liable for a broker's alleged
misrepresentations and that it cannot be held to have deceived
plaintiff when defendant provided accurate descriptions of the
loan terms at the time of closing and on the closing documents.
(Docket Entry # 37).

     Section two of chapter 93A prescribes "[u]nfair methods of
competition and unfair or deceptive acts or practices."  Mass.
Gen. Laws ch. 93A, § 2(a).  The statute, however, does not define
either "unfair" or "deceptive."  See Arthur D. Little, Inc. v.
Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998); see also In Re
Pharmaceutical Indus. Avg. Wholesale Price Litig., 491 F.Supp.2d
20, 93 (D.Mass. 2007) ("Chapter 93A gives no definition of
'unfairness,' and Massachusetts courts have refrained from
establishing such a definition"); see also Boston Pilots v. Motor
Vessel Midnight Gambler and East Coast Excursions, Inc., 357 F.3d

129, 134 (1st Cir. 2004) ("precise contours of ch. 93A liability have remained somewhat undefined").

Chapter 93A, though imprecise, has been held to pertain to certain practices:

> Massachusetts courts have, however, enumerated several factors to be considered when determining whether a practice is unfair: "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

In Re Pharmaceutical Indus. Avg. Wholesale Price Litig., 491 F.Supp.2d at 93-94.  "Additional consideration may be given to the 'equities between the parties,' 'what a defendant knew or should have known,' and 'a plaintiff's conduct, his knowledge, and what he reasonably should have known.'"  Id. at 94 (quoting Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983)); see Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 41 (1st Cir. 1998) (to state a chapter 93A claim, "the defendant's conduct must be not only wrong, but also egregiously wrong").

To prove a claim under chapter 93A, "it is neither necessary nor sufficient that a particular act or practice violate common or statutory law."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d at 69 (citing Kattar v. Demoulas, 739 N.E.2d 246, 257 (Mass. 2000)).  Rather, "because '[t]here is no limit to human inventiveness in this field,' Massachusetts courts evaluate unfair and deceptive trade practice

claims based on the circumstances of each case." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d at 69 (citing Kattar v. Demoulas, 739 N.E.2d at 257).  In doing so, "Massachusetts leaves the determination of what constitutes an unfair trade practice to the court's performance of a legal gate-keeping function." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d at 69; see Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008) ("[a]lthough whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law"); see also Incase Inc. v. Timex Corp., 488 F.3d at 56-57 ("[a] ruling that conduct violates [chapter] 93A is a legal, not factual, determination").

As stated above, there is no evidence in the record that defendant influenced either plaintiff to enter into a bad mortgage or Havkin to relay misleading information to plaintiff. Havkin was not in an agency relationship with defendant and there was no direct interaction between plaintiff and defendant during the negotiation process for which defendant could be held liable. See Speakman v. Allmerica Fin. Life Ins., 367 F.Supp.2d 122, 142 (D.Mass. 2005) (a corporation's parents, subsidiaries and other affiliates are not liable for the actions of the corporation under chapter 93A "unless they played an active role in the

alleged wrongful conduct" nor may claims against such affiliates be based on conclusory allegations).  Defendant, rather, provided accurate disclosures of the loan terms to plaintiff on the closing documents and accompanying disclosure statements.  As such, defendant cannot be held to have undertaken any immoral, unethical or unscrupulous actions that plaintiff relied upon to his detriment.

In a case similar to that at bar, a plaintiff alleged unfair and deceptive conduct in that the final terms of a mortgage offered by the defendant lender, and signed by the plaintiff, were less favorable than terms previously offered by defendant. Hogan v. Riemer, 619 N.E.2d at 985.  Despite the plaintiff's claim that "[the defendant] had lured [the plaintiff] into a loan more onerous than initially described to her," summary judgment was affirmed in the defendant's favor.  Id. at 985-86.  The court held that though the parties "discussed loan terms at variance with those later reflected in the loan papers, the detailed and integrated legal documents, executed by [the plaintiff] with her lawyer by her side would, in the absence of fraud, supersede earlier conversations."  Id. at 987.  As in the case at bar, there was no evidence in the record to "suggest fraud in the sense that the content of the documents or their significance at the time of closing was misrepresented" by the defendant.  Id. at 987-88.

33

As no agency relationship existed between Havkin and
defendant and as defendant was not part of the negotiation
process, it cannot be shown that defendant made any deceptive
representations during the refinancing negotiations and, as
defendant provided accurate disclosures at the closing, plaintiff
cannot rely on Havkin's statements to establish a deceptive trade
action against defendant per section two of chapter 93A.

B.   Unfair Conduct Per the Terms of the Loan

Plaintiff further contends that, separate from and in
addition to Havkin's alleged misrepresentations, the terms of the
final refinanced mortgage loan facially violate chapter 93A[10] and
are unfair as a matter of law.   (Docket Entry # 45).[11]   As noted,
the alleged unfair or deceptive practice must exist within at
least the penumbra of some commonlaw, statutory or other
established concept of unfairness or be immoral, unethical,
oppressive or unscrupulous.   See In Re Pharmaceutical Indus. Avg.
Wholesale Price Litig., 491 F.Supp.2d at 93-94.   To meet these
criteria, plaintiff alleges that the terms of the final
refinanced loan rise to a common law definition of unfairness.

---

[10]   Absent plaintiff's specificity, this court applies sections
two & nine to this prong of plaintiff's chapter 93A claim.

[11]   The legality of the final terms of the loan, per chapter
93A, was not raised in the complaint (Docket Entry # 1) but
rather is challenged only in plaintiff's brief in opposition to
summary judgment (Docket Entry # 45).

Massachusetts courts have held that under some circumstances mortgage loans with certain characteristics are facially "unfair" and in violation of chapter 93A.  See, e.g., Commonwealth v. Fremont Inv. & Loan, 2008 LEXIS 46 (Mass.Super. Feb. 25, 2008), aff'd 897 N.E.2d 548 (Mass. 2008); Commonwealth v. H & R Block, Inc., 2008 LEXIS 427 (Mass.Super. Nov. 25, 2008); Doyle v. U.S. Bank, 2009 LEXIS 283 (Mass.Super. Oct. 20, 2009).  The Fremont courts held that:

> [L]oans featuring a combination of the following four characteristics qualified as "unfair" under G.L. c. 93A, §2: (1) the loans were ARM [adjustable rate mortgage] loans with an introductory period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had [the defendant] measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty (defined by the [lower court] judge as a greater than the "conventional prepayment penalty" defined in G.L. c. 183C, §2) or a prepayment penalty that extended beyond the introductory rate period.

Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d at 554; see 2008 LEXIS 46, *29-31.  Plaintiff submits that his refinance loan from defendant meets the above characteristics.  (Docket Entry # 45).

The underlying rationale in Fremont was to prohibit loan terms that would make it "almost certain the borrower would not be able to make the necessary loan payments, leading to default and then foreclosure."  Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d at 551.  The four Fremont characteristics, however, are

not per se unfair; these conditions, rather, "may under certain circumstances make a loan unfair" including their issuance "with utter disregard for risk of foreclosure." Commonwealth v. H & R Block, Inc., 2008 LEXIS 427, *17; see Latham v. Homecomings Fin. LLC, 2009 WL 6297593, *6 ("[t]he combination of independently legal terms may render a loan unfair under Chapter 93A if the combination constitutes an unsound lending practice and in essence dooms the borrower to foreclosure").

Plaintiff fails to evince that the terms of his loan meet the four Fremont characteristics or that the loan was issued with utter disregard to the risk of foreclosure.  Plaintiff, in both his April 13, 2007 letter to Elite and in his complaint, alleges the illegality of the loan only in that it provided no benefit to plaintiff.  (Docket Entry # 1; Docket Entry # 46, Ex. 13). Plaintiff's brief in opposition to summary judgment later levies conclusory statements that plaintiff's mortgage resembles that in Fremont but offers neither evidence nor a detailed argument that plaintiff's loan met the four Fremont characteristics or was issued with disregard to the risk of foreclosure.

Where, as here, plaintiff has not "proffered evidence that the combination of features contained in his note constitutes an unsound lending practice which in essence dooms the borrower to foreclosure," plaintiff "has no reasonable expectation of proving that [defendant] violated Chapter 93A by originating a

presumptively unfair loan."  <u>Latham v. Homecomings Fin. LLC</u>, 2009
WL 6297593, *6 (summary judgment granted in the defendant
lender's favor where "summary judgment record is devoid of
evidence that [the plaintiff's] debt-to-income ratio would have
exceeded fifty percent had [the defendant] measured his debt by
the fully indexed rate or that the loan-to-value ratio was one
hundred percent").

There is a similar lack of evidence and specificity in this
matter.  As plaintiff has failed to demonstrate plaintiff's loan
was issued with disregard to the risk of foreclosure or that the
loan met the four <u>Fremont</u> characteristics or otherwise violated
the applicable standard of a section nine violation, plaintiff
cannot rely on this argument to maintain a chapter 93A claim.

C.  <u>Chapter 93A Demand Letter</u>

Defendant submits that plaintiff's claim falls under section
nine of chapter 93A and is therefore precluded as a matter of law
because plaintiff failed to send defendant the required written
demand of relief prescribed therein.  (Docket Entry # 37).
Plaintiff maintains that, to the extent that his claim does fall
under section nine, plaintiff complied with this prerequisite by
mailing the April 27, 2007 demand letter that, although sent to
Elite, was responded to by defendant.  (Docket Entry # 45; Docket
Entry # 46, Ex. 13).  Plaintiff further argues that, because
defendant does not maintain a place of business or keep assets

within Massachusetts, the demand letter prerequisite does not apply to this matter.  (Docket Entry # 45).

Section 9(3) of chapter 93A mandates that, "[a]t least thirty days prior to the filing of a [chapter 93A] action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."  Mass. Gen. Laws ch. 93A, § 9(3). The respondant has 30 days thereafter to tender a settlement before a suit may be filed.  Mass. Gen. Laws ch. 93A, § 9(3). This "statutory notice requirement is not merely a procedural nicety, but, rather 'a prerequisite to suit.'"  Rodi v. New Eng. Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004); see Entrialgo v. Twin City Dodge, Inc., 333 N.E.2d 202, 204 (Mass. 1975) ("demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved").

Defendant claims that plaintiff failed to meet this prerequisite in that plaintiff did not mail a demand letter directly to defendant.  Defendant's argument fails because defendant's thorough response to the letter, which was in compliance with section nine of chapter 93A, constructively satisfied the purpose of the demand letter requirement, which is making the respondent aware of claimant's grievance and providing

an opportunity to settle the claim prior to litigation.  <u>See</u>
<u>Entrialgo v. Twin City Dodge, Inc.</u>, 333 N.E.2d at 204 ("[t]he
purpose of the demand letter is to facilitate the settlement and
damage assessment aspects of c. 93A"); <u>see</u> <u>also</u> <u>Lily Transp.</u>
<u>Corp. v. Royal Inst. Servs., Inc.</u>, 832 N.E.2d 666 (Mass.App.Ct.
2005) (purpose of enacting chapter 93A was to encourage more
equitable behavior in the marketplace).

        Defendant was put on notice of plaintiff's claim, and
defendant's liability in potential litigation, as demonstrated by
defendant's answering plaintiff's letter itself.  In addition, by
answering the letter addressed to Elite, defendant likely
prevented plaintiff from sending an additional and separate
letter to defendant.  In light of defendant's thorough response
to the letter sent to Elite, it would be reasonable for plaintiff
to consider sending an additional letter to defendant to be a
superfluous undertaking.

        The sufficiency of plaintiff's demand letter is a non-issue,
however, in light of his inability to demonstrate an unfair or
deceptive business practice on the part of defendant.  This court
finds no genuine issues of material fact regarding plaintiff's
chapter 93A claim.  As plaintiff fails to evince an unfair or
deceptive trade action for which defendant may be held liable,
summary judgment is warranted in defendant's favor on Count IV.

IV.  Negligence (Count V)

Count V alleges that, as a licensed mortgage company, defendant is liable for negligent misrepresentation or deceit[12] because it "owed a duty to ensure fair dealings" and that, as a result of defendant's failure to oversee or rectify Havkin's allegedly deceitful actions, plaintiff suffered significant harm while defendant obtained a benefit.  (Docket Entry # 1, ¶¶ 65-68).

Defendant counters that it is not liable for false representations made by Havkin and that a claim of deceit or negligence cannot lie where defendant disclosed accurate descriptions of the loan terms to plaintiff.  (Docket Entry # 37).  Further, a lender owes no duty of care to a borrower and that, even if an agency relationship existed between Havkin and

---

[12]  Plaintiff references "negligent misrepresentation or deceit" in his brief in opposition to summary judgment (Docket Entry # 45) but alleges only "negligence" in his complaint (Docket Entry # 1, ¶¶ 61-68).  The fact that Count V "is titled 'negligence' rather than 'negligent misrepresentation' is not determinative.  The 'nature and character of the pleading is determined by its substance and not its title, name or description attached to it.'"  LBM Fin., LLC v. Individual Lot, LLC, 2010 WL 1050531, *2 (Mass.Super. Feb. 24, 2010); see City of Worcester v. HCA Mgmt. Co., Inc., 1994 WL 123629, *1 (D.Mass. Apr. 7, 1994) (negligent misrepresentation count "is not subject to the particularity requirement of Fed. R. Civ. P. 9(b)"); see also Grafton Partners, LLC v. Barry & Foley Motor Transp., Inc., 2007 WL 1418529, *3 (Mass.Super. Apr. 9, 2007) (as negligent misrepresentation is not a claim that must be plead with specificity, a party is not prejudiced by a failure to properly name the count in the complaint, where all the allegations necessary to sustain the claim of negligent misrepresentation appear in the complaint).

defendant, the accurate disclosures break any causal connection between Havkin's alleged misrepresentations and plaintiff's injury. (Docket Entry # 37).

To establish a claim for negligent misrepresentation, plaintiff must establish that defendant "made a false representation of material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act on this representation" and that plaintiff "reasonably relied on the representations as true, and . . . acted upon it to [his] damage." Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 47 (Mass. 2009); see Edlow v. RBW, LLC, 2010 WL 2034772, *7 (D.Mass. May 21, 2010); see also Trifiro v. N.Y. Life Ins. Co., 1987 LEXIS 6833, *11 ("to make out a claim for deceit or negligent misrepresentation, [plaintiff] must show that [defendant] made an intentional, reckless or negligent misrepresentation of material fact meant to be relied upon and in fact relied upon").

Plaintiff fails to demonstrate that defendant made a false representation of material fact for the purpose of inducing plaintiff to act.  As discussed above, plaintiff fails to provide evidence that defendant or Wilson influenced Havkin's alleged statements or that defendant acted in a manner which would permit plaintiff to reasonably believe that Havkin was an agent of defendant.  In the first interaction that defendant did have with

41

plaintiff, defendant provided plaintiff with accurate
descriptions regarding the terms of the loan.  As Havkin is not
an agent of defendant, it cannot be held that defendant made any
false representations of material fact to plaintiff.

Plaintiff again cites Trifiro v. N.Y. Life Ins. Co., 1987
LEXIS 6833.  Plaintiff proffers that because the Trifiro court
found an issue of material fact regarding whether the NYL agent
acted with sufficient ostensible authority, summary judgment as
to a claim of negligent misrepresentation or deceit was denied in
Trifiro's favor.  (Docket Entry # 45).  A closer reading of the
opinion, however, finds that the court held that even if the
agent acted with ostensible authority, the circumstances
surrounding the agent's representations made it unreasonable for
Trifiro to rely upon them; as a result, Trifiro's claim was
rejected and summary judgment entered for NYL.  Id. at *11-15.

Trifiro, therefore, stands for the proposition that reliance
must be reasonable to state a claim for negligent
misrepresentation.  The fact that the closing documents contained
terms vastly different than those negotiated made it unreasonable
for plaintiff to rely on Havkin's representations.  (Docket Entry
# 39, Ex. I & M).  Regardless, as discussed above, Havkin is
neither the actual nor apparent agent of defendant, and plaintiff
has proffered no evidence that Havkin acted with any authority
from defendant.

In addition to a showing of negligent conduct, a duty of care is an essential element of any negligence claim.  See Siegal v. Am. Honda Motor Co., 921 F.2d 15, 17 n.4 (1st Cir. 1990). "Under Massachusetts law, every contract is subject to an implied covenant of good faith and fair dealing" with the purpose to "'ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract' and that . . . the parties remain faithful to the intended and agreed expectations of the contract.'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (quoting Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007)).

"In the lender-borrower context, the implied covenant 'would require that the bank be honest in the dealings with [plaintiff] and that it not purposefully injure [his] right to obtain the benefit of the contract." FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (quoting Chokel v. Genzyme Corp., 867 N.E.2d at 329); see Corcoran v. Saxon Mortgage Servs., Inc., 2010 WL 2106179, *4 ("[defendant] does not owe plaintiff a duty to ensure fair dealings because a lender owes no general duty of care to a borrower"); see also Pimental v. Wachovia Mortgage Corp., 411 F.Supp.2d at 39-40 (a negligence claim fails where there is no fiduciary duty between lender and borrower).

As defendant provided accurate descriptions of the loan terms at the time of closing and cannot be held liable for any

alleged misrepresentations by Havkin, plaintiff has made no showing that defendant undertook any negligent conduct that would violate a duty of care.  Since plaintiff can show no improper conduct on defendant's part, and as no fiduciary relationship exists between a lender and a borrower, plaintiff's negligence claim fails.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (claims must have involved dishonesty and a showing that defendants acted purposefully to injure plaintiff).

Massachusetts law also requires that plaintiff establish, "by a preponderance of the evidence, the existence of a causal connection between the defendant's actions (or inactions) and the injury sustained by the plaintiff." Jorgensen v. Mass. Port Auth., 905 F.2d 515, 524 (1st Cir. 1990); see Stuart v. Town of Brookline, 587 N.E.2d 1384, 1387 (Mass. 1992) (the plaintiff bears the burden of showing that the injuries are "'causally related to the [defendant's actions]'").  "This connection cannot be left to the jury's conjecture or speculation." Jorgensen v. Mass. Port Auth., 905 F.2d at 524.  Plaintiff must show that the "defendant's conduct was a but-for cause of [plaintiff's] injury and that defendant's conduct was a 'substantial legal factor' in bringing about the alleged harm to the plaintiff." Id.; see Payton v. Abbott Labs, 780 F.2d 147, 156 (1st Cir. 1985) ("the plaintiff must prove it is 'more likely than not that the conduct of the defendant was a substantial factor in bringing about the

harm'"); <u>see</u> <u>also</u> <u>Embriano v. Grosnick</u>, 892 F.Supp. 20, 22 n.5 (D.Mass. 1995).[13]

Plaintiff cannot link Havkin's alleged misrepresentations to any conduct on behalf of Wilson or defendant.  As there is no evidence that defendant took any action to cause plaintiff's pecuniary injury, there is no causal connection between the injury and defendant's actions.  Regardless, the accurate descriptions of the loan terms supplied by defendant break any causal connection between Havkin's conduct and plaintiff's injury.  In short, plaintiff's failure to sustain a claim for negligent misrepresentation or deceit thereby merits summary

---

[13] The economic loss doctrine may also present challenges to plaintiff's claim.  "In the context of ordinary negligence claims in tort actions, the Supreme Judicial Court has held that 'purely economic losses are unrecoverable . . . in the absence of personal injury or property damage."  <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 24 (1st Cir. 2001).  There has been discussion in Massachusetts courts regarding whether the doctrine applies to negligent misrepresentation.  If applied to a negligent misrepresentation claim with only an economic injury, "even if a duty existed, the claim is barred by the economic loss doctrine which provides that, in negligence actions, 'purely economic losses are unrecoverable . . . in the absence of personal or property damage."  <u>Corcoran v. Saxon Mortgage Servs., Inc.</u>, 2010 WL 2106179, *4 (quoting <u>FMR Corp. v. Boston Edison Co.</u>, 613 N.E.2d 902, 903 (Mass. 1993)); <u>compare</u> <u>with</u> <u>Danca v. Taunton Sav. Bank</u>, 429 N.E.2d 1129, 1134 (Mass. 1982) (the economic loss doctrine does not apply to negligent misrepresentation).  By applying the economic loss doctrine, the <u>Corcoran</u> court rejected a negligent misrepresentation claim because the "alleged damages, the additional costs and interest accrued on the loan, are purely economic in nature."  <u>Corcoran v. Saxon Mortgage Servs., Inc.</u>, 2010 WL 2106179 at *4.  If the economic loss doctrine was applied to this matter, plaintiff likewise would not have pled a recoverable loss.

judgment in defendant's favor on Count V.

CONCLUSION

In accordance with the foregoing discussion, defendant's motion for summary judgment (Docket Entry # 36) is **ALLOWED**.


            /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge